UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                                    Bankruptcy No. 09-30689
                                                          Chapter 7
Derek D. Myron and Misti L. Myron,

              Debtors.
_____/

Scott Churchill,

              Plaintiff,

              vs.                                     Adversary No. 09-7029

Derek D. Myron and Misti L. Myron,

              Defendants.
_____/

**MEMORANDUM AND ORDER**

By complaint filed September 18, 2009, Plaintiff Scott Churchill initiated this adversary proceeding seeking a determination that the debt owed to him in the amount of $33,063.90, plus interest, lost profits, and attorney's fees and costs by Debtors/Defendants Derek D. Myron and Misti L. Myron is nondischargeable pursuant to 11 U.S.C. § 523(a)(2), (4) and (6). Misti L. Myron filed an answer on October 20, 2009, and Derek D. Myron filed an answer on February 10, 2010. The matter was heard on May 6, 2010.

I. Findings of Fact

Plaintiff Scott Churchill testified that he has been involved in the construction business since 1976. Churchill and Derek Myron became acquainted when they both worked at Sterling Seamless Siding & Remodeling. Churchill characterized his work at Sterling as piecework that he and another person ("the third party") made, and Derek Myron worked in a different department. Churchill,

Derek Myron, and the third party decided to strike out on their own and do a job in Devils Lake, North Dakota, and split the proceeds three ways. Churchill testified that he and Derek Myron had problems with the third party and decided to split off from him and go into business on their own.

According to Churchill, the first job he and Derek Myron did together was with ICS in Warroad, Minnesota. Derek Myron had a Minnesota contractor's license, but Churchill did not. They got the job through Churchill's connections because he knows the owners of ICS, his younger brother is a foreman for ICS, and Churchill played hockey with the "head guy" at ICS. The job included installing siding, soffit and fascia.

ICS was not ready for them to begin the primary work immediately, but Churchill and Derek Myron were able to begin with siding a storage shed. Meanwhile, a tornado went though Northwood, North Dakota, and Churchill and Derek Myron went to Northwood to shingle because ICS was not ready for them in Warroad. They roofed four houses in Northwood before returning to the job in Warroad.

Churchill testified that the job in Warroad was big, and they needed a trailer for them to store their tools and equipment. Churchill and Derek Myron found a 16-foot enclosed trailer, and Paula Anderson, the owner of Sterling Seamless Siding & Remodeling, gave Churchill a personal loan to buy the trailer. Anderson wrote a check for $5,680.00 payable to Grand Auto Leasing dated August 17, 2007. The title to the trailer indicates it was purchased by Derek Myron, but Churchill explained that his understanding was that although the trailer was put into Myron Construction's name, it would remain his trailer. His explanation for this was that Derek Myron wanted to be able to write off the expense of the trailer, but that they agreed the trailer would be his at the end of the job because Churchill obtained the money to purchase the trailer.

2

      Churchill decided to leave Warroad on December 20, 2010, because he felt that he was doing all the work.  According to Churchill, Derek Myron was not pulling his weight because rather than working, Derek Myron was either at the bar or at his girlfriend's home.  When Churchill left Warroad, he pulled the empty trailer back and parked it at his parents' house. Churchill had been storing tools in his parents' garage, and he put them into the trailer.  One and a half months after Churchill moved the trailer to his parents' driveway, Churchill filed this lawsuit against Derek Myron, and Derek Myron took the trailer.

      Immediately after Derek Myron took the trailer, Churchill made a list of the tools that were in the trailer.  The list includes the replacement value of each tool.  The total value Churchill placed on the tools that were in the trailer is $4,463.00-4,663.00.[1]  He acknowledged that all of the tools in the trailer were used but said that most of the high-value items were relatively new.  He testified that because he has been in the construction business since 1974, he had accumulated a lot of tools.

      As for Misti Myron's involvement, Churchill said that either he or Derek Myron called her from job sites, told her the measurements for the job, and had her send out bills for their work.  Misti Myron similarly testified that her involvement with Myron Construction was minimal and involved taking their calls while they were at a job and writing down what work they had done and how much to charge.

      In January 2008, Churchill and Misti Myron went through each invoice from the work that he and Derek Myron had done, and Misti Myron wrote down all the dates and amounts Churchill was paid.  Churchill estimated that Derek Myron owed him more than $20,000 by the time Churchill

---

[1] The value includes a range because Churchill included "odds and ends" valued at $300-500.

3

left Warroad. Churchill claimed that neither he nor Misti Myron were getting any money from Derek Myron because Derek Myron would cash the checks from ICS and keep all the money.

The invoices for the work Churchill and Derek Myron did together were admitted into evidence. Misti Myron prepared all of the invoices except one that Churchill prepared. The invoices total $91, 811.55. However, an invoice to ICS dated December 31, 2007, lists the amount due to be $35, 075.30, but Churchill testified that that invoice was never sent; rather, an invoice for $23,000 was sent, and ICS paid $23,000. Churchill's handwritten notes on the December 31, 2007 invoice list the amount due as $23,656.90. The Court has no reason to doubt Churchill's representation that $23, 656.90 is the correct amount of the invoice. This clarification is a statement against his own interest in that it supports a finding that he is entitled to less than the printed invoice amount. The Court therefore concludes that the total amount of all the invoices is $80,393.15.[2] Churchill estimated that Derek Myron paid him between $8,000 and $10,000.

Churchill testified that Derek Myron did not pay him despite his promises of a 50/50 partnership. Churchill said he relied on Derek Myron's promise and continued to work based on Derek Myron's promise to pay. He said he would not have worked for Derek Myron if not for their agreement that they were equal partners.

Derek Myron did not testify.

Derek and Misti Myron are now divorced.

## II. Conclusions of Law

The statutory exceptions to discharge in bankruptcy are narrowly construed to effectuate the fresh start policy of the Bankruptcy Code. Owens v. Miller (In re Miller), 276 F.3d 424 (8th Cir.

---

[2] $91,811.55 - 11, 418.40 (the difference between 35,075.30 and 23,656.90).

4

2002).  Accordingly, a creditor opposing discharge of a debt must prove the debt falls within an exception to discharge.  Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993).  The standard of proof for exceptions to discharge under 11 U.S.C. § 523(a) is the preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286 (1991).

    1.    11 U.S.C. § 523(a)(2)(A)

The Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— (A) false pretenses, a false representation, or actual fraud . . . ." 11 U.S.C. § 523(a)(2)(A).  The language "obtained by" clearly indicates that the fraudulent conduct occurred at the inception of the debt, i.e., the debtor committed a fraudulent act to induce the creditor to part with its money, property or services.  See Community Nat'l Bank v. Slominski (In re Slominski), 229 B.R. 432, 435 (Bankr. D.N.D. 1998). If this threshold showing is made, the creditor must prove each of the following elements to establish nondischargeability of a debt under section 523(a)(2)(A):

    (1)    the debtor made a representation;
    (2)    the debtor knew the representation was false at the time it was made;
    (3)    the representation was deliberately made for the purpose of deceiving the creditor;
    (4)    the creditor justifiably relied on the representation; and
    (5)    the creditor sustained the alleged loss as the proximate result of the representation having been made.

Burt v. Maurer (In re Maurer), 256 B.R. 495, 500 (B.A.P. 8th Cir. 2000); Legendary Leasing, Inc. v. Glatt, (In re Glatt) 315 B.R. 501, 509 (Bankr. D.N.D. 2004).

As to the first element, Churchill testified that Derek Myron represented that they were equal partners.  Notably, Derek Myron did not testify, and Debtors did not present any evidence refuting

this allegation. The only evidence, therefore, supports a finding that Derek Myron represented that he and Churchill were equal partners.

Next, in assessing a debtor's knowledge of the falsity of a representation, the court must consider the knowledge and experience of the debtor. Legendary Loan Link, LLP v. Glatt (In re Glatt), 315 B.R. 511, 520 (Bankr. D.N.D. 2004) (citing The Merchants Nat'l Bank of Winona v. Moen (In re Moen), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999)). A false representation made under circumstances where a debtor should have known of the falsity is one made with reckless disregard for the truth and satisfies the knowledge requirement. Id.

Derek Myron should have known of the falsity of the representation that they were equal partners, and the knowledge requirement is met.

The intent element of section 523(a)(2)(A) does not require a finding of malevolence or personal ill will; all it requires is a showing of an intent to induce the creditor to rely and act on the misrepresentations in question. In re Moen, 238 B.R. at 791. Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, a creditor may present evidence of the surrounding circumstances from which intent may be inferred. Universal Bank, N.A. v. Grause (In re Grause), 245 B.R. 95, 99 (B.A.P. 8th Cir. 2000). Intent to deceive will be inferred where a debtor makes a false representation and the debtor knows or should know that the statement will induce another to act. In re Moen, 238 B.R. at 791.

Derek Myron should have known that Churchill would be induced to work for the benefit of the partnership when he falsely represented that he and Churchill were equal partners. Debtors did not present any contrary evidence. The Court therefore infers Derek Myron's intent to deceive.

As to the final two elements, Churchill justifiably relied on Derek Myron's representation that they were equal partners by working with Derek Myron. Churchill also sustained the loss of a portion of his one-half of the proceeds as the proximate result of the representation having been made. Again, Debtors did not present any contrary evidence.

Accordingly, Churchill has proven each of the elements under section 523(a)(2)(A) by a preponderance of the evidence. In his complaint, Churchill claimed that he was entitled to half of $66,237.80 ($33,063.93) for the work on the Warroad job. At trial, Churchill also asserted that he was entitled to half of the proceeds from the roofing jobs in Northwood. The total amount of all the invoices is $80,393.15. Half of $80,393.15 is $40,196.58, and the Court will subtract $9,000 from that amount because Churchill estimated that Derek Myron paid him between $8,000 and $10,000 for his work. The debt in the total amount of $31,196.58 is therefore excepted from discharge under section 523(a)(2)(A).

Derek and Misti Myron are now divorced. Misti Myron was only involved in Myron Construction in a ministerial manner, and there is no evidence that she played any part in the false representation about the equal partnership between Churchill and Derek Myron. The $31,196.58 debt is therefore nondischargeable only as against Derek Myron and not Misti Myron.

2. 11 U.S.C. 523(a)(4)

Churchill also argues that the debt for his half of the work proceeds is nondischargeable under section 523(a)(4). Because the Court concluded that that debt is nondischargeable under section 523(a)(2), it need not reach the issue of dischargeability under section 523(a)(4).

7

      3.      11 U.S.C. § 523(a)(6)

The Bankruptcy Code provides that an individual debtor in a Chapter 7 case is not discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). In this context, the term willful means deliberate or intentional. Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998); Hobson Mould Works, Inc. v. Madsen (In re Madsen), 195 F.3d 988, 989 (8th Cir. 1999). The injury, and not merely the act leading to the injury, must be deliberate or intentional. Geiger, 523 U.S. at 61- 62. Malice requires conduct which is targeted at the creditor, at least in the sense that the conduct is certain or almost certain to cause financial harm. Madsen, 195 F.3d at 989. Malice requires conduct more culpable than that which is in reckless disregard of the creditor's economic interests and expectancies. Ehrman v. Feist (In re Feist), 225 B.R. 450, 454 (Bankr. N.D. 1998). A debtor acts with malice by intending or fully expecting to harm the economic interests of the creditor. Id. "Intentional harm is difficult to establish, but the likelihood of harm in an objective sense may be considered in evaluating intent." Osborne v. Stage (In re Stage), 321 B.R. 486, 493 (B.A.P. 8th Cir. 2005). The debtor's knowledge that he or she is violating the creditor's legal rights is insufficient to establish malice absent additional aggravating circumstances. Johnson v. Logue (In re Logue), 294 B.R. 59, 63 (B.A.P. 8th Cir. 2003).

In this case, Derek Myron took the trailer containing Churchill's tools from Churchill's parents' driveway. The title to the trailer, however, is in Derek Myron's name. Although Churchill asserted rightful ownership of the trailer, the name on the title supports a finding that Derek Myron may not have violated Churchill's legal rights, much less intended to harm Churchill. Further, there

is no evidence to suggest that Derek Myron knew Churchill's tools were in the trailer. Churchill's claim under section 523(a)(6) therefore fails.

Based on the foregoing, the outstanding obligation owed by Debtor/Defendant Derek D. Myron to Plaintiff Scott Churchill in the amount of $31,196.58 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2). The Court has considered all other arguments and deems them to be without merit.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this June 10, 2010.

**WILLIAM A. HILL, JUDGE
U.S. BANKRUPTCY COURT**